UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA HOWARD,

                    Plaintiff,

        v.                                          Case No. 20-cv-1850-pp

ANTHONY ASHWORTH, *et al.*,

                    Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANTS
WALL AND WEIRENGA (DKT. NO. 77), GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT (DKT. NO. 51) AND DISMISSING CASE**

Plaintiff Joshua Howard, who is incarcerated at Fox Lake Correctional Institution, filed a complaint alleging that the defendants had violated his constitutional rights when he was incarcerated at Waupun Correctional Institution. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on claims that Anthony Ashworth and Scott Eckstein—at the direction of Edward Wall and Steven Weirenga—allegedly intercepted the plaintiff's correspondence with Peg Swan and Jeff Poff in retaliation for the plaintiff's assistance to Swan with her advocacy for individuals incarcerated at Waupun and the class action lawsuit the plaintiff and Poff were preparing. Dkt. No. 9 at 15. The court also allowed the plaintiff to proceed on claims that Ashworth, Eckstein and Cory Sabish retaliated against him for his proposed class action against Waupun and for providing assistance and information to Swan regarding the abuse of individuals incarcerated at Waupun. Id. Specifically, the court allowed the plaintiff to proceed on claims that (1)

1

Ashworth and Eckstein destroyed evidence during their investigation of the plaintiff's Conduct Report 2471890; (2) Sabish disposed of the twelve-page exculpatory letter the plaintiff submitted as evidence at his hearing; (3) Sabish issued a revised finding of guilt based on evidence he received after the hearing; (4) Ashworth and Eckstein provided evidence to Sabish "post-due process hearing so that he could supplement the record and his findings, ex parte"; and (5) Sabish provided a supplemental certiorari record which was "added to the record on appeal, ex parte," and which omitted several exculpatory documents. Id. at 14-16. On July 19, 2023, the court denied the defendants' motion for summary judgment on exhaustion grounds and clarified that the plaintiff could proceed on his claim that Ashworth and Eckstein issued the plaintiff Conduct Report 2471890 in retaliation for communicating with Peg Swan, a prison advocate. Dkt. No. 45 at 18-19 n.6.

The defendants have filed a merits-based motion for summary judgment. Dkt. No. 51. Along with the plaintiff's response to the defendants' motion, he filed a motion to dismiss defendants Wall and Weirenga. Dkt. No. 77. The court will grant that motion and dismiss Wall and Weirenga, grant the defendants' motion for summary judgment as to the remaining defendants and dismiss the case.

2

## I.      Facts[1]

The plaintiff was incarcerated at Waupun Correctional Institution during the events described in the complaint. Dkt. No. 53 at ¶2. Defendant Anthony Ashworth was employed by the Wisconsin Department of Corrections (DOC) from January 1996 until February 2019. Id. at ¶3. During the events described in the complaint, Defendant Scott Eckstein was Deputy Warden at Redgranite Correctional Institution. Id. at ¶4. Defendant Cory Sabish worked at Waupun as a lieutenant and was captain at the time of the events described in the complaint. Id. at ¶5.

From 2010 to 2014, the plaintiff was involved with several lawsuits involving DOC staff at Waupun, and he was active in trying to change the conditions there. Dkt. No. 80 at ¶1. The plaintiff was preparing to file a class action lawsuit which focused on the dental, medical and mental health care at Waupun. Id. By 2014, the plaintiff also had noticed problems with the use of excessive force in Waupun's segregation unit. Id. at ¶2. Incarcerated individuals shared with the plaintiff reports of excessive use of force. Id.

In 2010, the plaintiff was introduced to Peg Swan through another incarcerated individual, Jeff Poff. Dkt. No. 80 at ¶3. Swan ran a non-profit called Forum for Understanding Prisoners (FFUP) that was devoted to helping incarcerated persons. Id. In early 2014, Swan informed the plaintiff that she had found an investigative journalist who wanted more information about the

_____

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

3

"seg abuse" issue. Id. The plaintiff forwarded details of incidents that had been reported to him so that Swan could provide them to the reporter. Id. On July 20, 2014, investigative journalist Bill Lueders released a three-part series which detailed forty allegations of abuse and profiled Swan and her efforts to expose the abuse. Id. at ¶8. After Lueders's articles came out, Swan filled out a Petition for Humane Treatment of Prisoners at Waupun Correctional Institution at MoveOn.org, which cited the articles and called for an investigation into the abuse allegations. Id. at ¶9. The story then was discussed in a July 29, 2014 Milwaukee Journal Sentinel article titled "Faith Leaders Prod Scott Walker on Alleged Inmate Abuse." Id. at ¶10. The article reported on some of the fall-out from Lueders's articles and cited DOC Secretary Ed Wall as acknowledging a need to examine the state's use of solitary confinement. Id.

In 2014, the plaintiff agreed to add Poff to his class action lawsuit if Poff paid part of the filing fee. Dkt. No. 80 at ¶5. In May 2014, Poff asked to send money from his release account to Swan to sponsor his lawsuit, but his social worker denied the request, explaining that Poff's request must include an itemized bill from the person to whom he wanted to send money. Id. at ¶¶6-7. On August 8, 2014, following the instructions from Poff's social worker that his disbursement request must include an itemized bill, Swan sent Poff a bill listing the past advocacy work for which she was charging him. Id. at ¶11. Swan's letter to Poff states: "As we agreed, I am billing you for the hours spent and resources used in the last few years we have worked together. These include research, blog work, phone and letter writing advocacy, copying and

4

postage. Please remit $200 (two hundred dollars) at your earliest convenience."
Dkt. No. 81-1 at 20. Poff received Swan's letter on August 11, 2014, and he
submitted it to his social worker along with a disbursement request. Id. at ¶12.
The next day, the social worker denied the disbursement request because it
was "not a detailed, itemized bill - no dates, hrs. spent + charged @ what rate."
Id. at ¶17.

On August 11, 2014, the DOC's Division of Adult Institutions (DAI), with
the help of the Office of Special Operations (OSO) out of the DOC's Central
Office, initiated an investigation into Swan's activities. Dkt. No. 53 at ¶13. DOC
staff had intercepted the letter Swan had sent to Poff in which she billed him
$200. Id. at ¶14. DAI Administrator Cathy Jess initiated the investigation into
Swan and assigned Eckstein as lead investigator and Ashworth (of the DOC's
OSO) as co-investigator. Dkt. No. 80 at ¶13.

A. Peg Swan Investigation

One of the DOC's responsibilities is to prevent scams. Dkt. No. 53 at ¶16.
The DOC has an interest in knowing how incarcerated individuals obtain
money, who they send money to and why, to ensure incarcerated persons or
the public are not being scammed out of money. Id. at ¶17. DOC staff also were
aware at the time of the OSO investigation that Swan had been sending
incarcerated individuals surveys after she was specifically informed not to do
so. Id. at ¶18. As part of the Swan investigation, Ashworth and Eckstein
started working with staff to intercept mail coming into the institutions from
Swan, as well as mail going out to Swan, to figure out the extent to which she

5

was surveying incarcerated individuals and seeking monetary compensation from them. Id. at ¶21.

On August 12, 2014, the plaintiff's cell was searched, and he subsequently filed a complaint about that search. Dkt. No. 80 at ¶18. The plaintiff had several files which chronicled stories of incarcerated individuals who claimed to have experienced excessive force in the segregation unit at Waupun, as well as correspondence from Swan which would have made it apparent to staff that he had been providing that information to her with the intent of publication. Id.

Starting on August 12, 2014, Eckstein copied and reviewed any incoming mail to the DOC from Swan and any outgoing DOC mail to her. Dkt. No. 80 at ¶19. The third letter on the seized mail log was read on August 13, 2014; it was a letter from Poff mailing out the bill and the social worker's denial. Id. The fourth letter on the mail log was a letter the plaintiff sent to Swan that referenced Poff's bill and lawsuits the plaintiff was going to file or had filed. Id. at ¶20; Dkt. No. 53 at ¶24. Because the letter from the plaintiff appeared to be related to the bill Swan had sent to Poff that was the subject of the investigation, the investigators wanted to follow up to ensure that money was not being exchanged between incarcerated individuals for legal work in violation of DOC rules. Id. at ¶¶25-26. Investigators searched further into the plaintiff's property and financial activity with Swan but a separate DAI Investigation never was conducted on the plaintiff, so the OSO investigators

just looked into potential unsanctioned activity they found while conducting the investigation into Swan. Id. at ¶27.

Eckstein and Ashworth learned through the investigation that the plaintiff had checks made payable to him and sent to a bank account in Pennsylvania entitled "Prisoner Assistant." Dkt. No. 53 at ¶30. The plaintiff was in communication with a third party who would take the funds from the Prisoner Assistant account and purchase things for the plaintiff from a catalog to send to him at the institution. Id. at ¶31. Ashworth contacted the Prisoner Assistant company to get information on this issue and the investigators collected receipts showing payment to the plaintiff's account from other incarcerated individuals. Id. at ¶32. On September 10, 2014, Ashworth authored a list of the thirty individuals whose property was in the plaintiff's cell, then highlighted the three incarcerated individuals from whom the Prisoner Assistant records showed the plaintiff received money. Dkt. No. 80 at ¶13. When was interviewed by Ashworth on September 11, 2014, one of the three—Adam Yeoman—denied that he had paid the plaintiff for legal work. Id.

The OSO investigators also completed several interviews with incarcerated persons who had had recent contact with Swan. Dkt. No. 53 at ¶33. Swan's visiting privileges were suspended pending the investigation, but she still communicated with incarcerated individuals using the mail. Id. at ¶34.

The plaintiff was placed on temporary lock up on September 6, 2014, and when he received his legal property on September 22, 2014, he noticed that a substantial amount of his legal work was missing. Dkt. No. 80 at ¶22.

7

He noticed that he also was missing some letters from Swan, including a twelve-page letter which included a memo from an attorney in Senator Lena Taylor's office. Id.

The investigation regarding Swan lasted about two months. Dkt. No. 53 at ¶23. Investigators conducted interviews with numerous incarcerated individuals. Id. Certain content from the interviews is redacted for the safety of the individuals who provided information to the investigators. Id.

B.    Conduct Report 2471890

In October 2014, Ashworth issued the plaintiff Conduct Report 2471890, which accused him of violating Wis. Admin. Code §§DOC 303.20 (Group Resistance and Petitions), 303.32 (Enterprises and Fraud), 303.30 (Unauthorized Forms of Communication) and 303.48 (Unauthorized Use of the Mail). Dkt. No. 53 at ¶35. In the conduct report, Ashworth stated that he and Eckstein had searched the plaintiff's property and that the "search revealed that [he] was in possession of the legal property and materials of 30 other inmates" and that there "was information that suggested that [he] was actively assisting several inmates with legal work and the appearance that he was doing this for monetary gain." Dkt. No. 80 at ¶25. The plaintiff states that Ashworth's investigation showed only that two incarcerated individuals might have paid him for help. Id.

Sabish was assigned to be the hearing officer for the disciplinary hearing on the conduct report. Dkt. No. 53 at ¶38. As part of the disciplinary hearing process, the plaintiff was assigned a staff advocate to assist him with obtaining

8

and submitting requests for evidence he wanted presented during his hearing. Dkt. No. 53 at ¶39. On October 17, 2014, Angelia Kroll, the plaintiff's assigned staff advocate, sent a memo to Sabish stating that the plaintiff was not requesting any witnesses to be present for his hearing and that he requested two letters from Swan that were deemed contraband to be considered as evidence. Id. at ¶40. Kroll also stated that Sergeant Dahlke had informed her that there was only one such letter—a twelve-page letter from Swan—and she stated that this twelve-page letter would be provided to Sabish as evidence for the hearing. Id. Before the due process hearing, the Security Director's Office Operations Associate (OOA) gave Sabish physical copies of the plaintiff's conduct report as well as evidence that was gathered by Ashworth during his investigation.[2] Dkt. No. 53 at ¶41.

The plaintiff's disciplinary hearing was held on October 20, 2014. Dkt. No. 53 at ¶42. He attended the disciplinary hearing and offered a written statement. Id. at ¶43. At the hearing, Sabish would have received any evidence submitted by the plaintiff from Kroll. Id. at ¶44. Sabish does not recall receiving or ever possessing the twelve-page letter from Swan to the plaintiff. Id. at ¶45. Kroll testified that charges for Group Resistance and Petitions (303.20) and Unauthorized Forms of Communication (303.30) were not supported. Id. at ¶47. The plaintiff gave an officer his written statement to give

---

[2] The plaintiff states that before the due process hearing, Sabish received the conduct report packet (Dkt. No. 56-1, Exh. 1014) but that Sabish did not receive evidence gathered by Ashworth during his investigation (Dkt. No. 56-2, Exh. 1015). Dkt. No. 79 at ¶41.

9

to the hearing officer, the May 13, 2014 memo from the social worker, the May 3, 2014 letter from Poff and the 42 U.S.C. §1983 instruction form. Dkt. No. 80 at ¶26. The hearing officer had a second officer bring the plaintiff the twelve-page letter submitted by the advocate so that the plaintiff could review it. Id. When he was finished the plaintiff handed it back to the second officer and the second officer gave it back to Sabish. Id. After he reviewed the twelve-page letter, Sabish asked the plaintiff what the significance of it was supposed to be, and the plaintiff replied that it documented that the bill had been reviewed by attorneys from Senator Taylor's office and that they had deemed it was perfectly legal and appropriate. Id. Except for the twelve-page letter, all the materials that were reviewed at the due process hearing are represented in the plaintiff's Exhibit 2009, at 8-16. Id. at ¶27.

Sabish found the plaintiff not guilty of violating the first, third and fourth rules listed on his conduct report. Dkt. No. 53 at ¶48. Sabish found the plaintiff guilty of Enterprise and Fraud, Wis. Admin. Code §DOC 303.32(1), because Sabish believed the plaintiff more likely than not violated the rule by attempting to have another incarcerated individual send money to a third party so that the third party could in turn send the money to the plaintiff. Id. at ¶49. Sabish noted in the decision that he had relied on the statement in Conduct Report 2471890 and "miscellaneous paperwork" to support his finding of guilt. Id. at ¶50. Sabish specifically wrote in the reason for decision section of the DOC-84 form:

> Inmate's statement found to be somewhat self-serving and somewhat credible as he states that he didn't violate any of the rules

> yet states that enterprise and fraud is generically supported but couldn't defend it because he didn't know who sent the money. The hearing officer feels the event, more likely than not, unfolded as recorded and ergo, finds the inmate guilty of 303.32 as he attempted to have another inmate send money to a third part (sic) to have them then in return send the money to [the plaintiff] for legal services as it is supported in the statement written in the conduct report.

Id. at ¶51. The plaintiff received a disposition of 120 days' disciplinary separation and "disposal of contraband." Id. at ¶52.

Once the due process hearing concluded, Sabish paperclipped all the evidence and conduct report documents together along with the DOC-84 form, and then gave the documents back to the Security Director's OOA. Dkt. No. 53 at ¶53.

C.    Plaintiff's Appeals

On October 27, 2014, the plaintiff appealed the conduct report decision to Warden Pollard arguing that: the wrong form was used for his Notice of Rights; the conduct report was unconstitutionally vague; it was not clear which act the hearing officer had found to have supported the charge of 303.32; and there was insufficient evidence to find him guilty of either allegation. Dkt. No. 53 at ¶54. Pollard affirmed the decision on October 30, 2014. Id.

On November 1, 2014, the plaintiff submitted offender complaint WCI-2014-21501, in which he raised several alleged procedural violations including: the allegations lacked specificity; it was not clear to which allegations the finding of guilt related; and there was no supporting evidence or documents pertaining to the first and third allegations. Dkt. No. 53 at ¶55; Dkt. No. 80 at ¶31.

11

On March 6, 2015, the institution complaint examiner recommended that the complaint be dismissed with modification and that the record be returned to the hearing officer for completion/correction. Dkt. No. 53 at ¶56. On June 23, 2015, the corrections complaint examiner also recommended dismissal with modification for complaint WCI-2014-21501. Id. at ¶57. The recommendation states:

> . . . Claims 1, 3 & 5: A review of the DOC-84 Disciplinary Hearing, Reasons for Decision and Evidence Relied Upon form shows it is incomplete. The following corrections need to be made: 1) Under the section Physical Evidence, the hearing officer must list the evidence relied upon. 2) Under the section Reason For Decision, the hearing officer must clearly articulate which evidence and testimony was evaluated and reviewed. 3) Under the section Reason For Decision, the hearing officer must clearly articulate how the evidence and the testimony that was subject to evaluation and review was considered to support the finding of guilt . . . No other exhausted deficiencies are noted. Therefore, it is recommended this appeal be dismissed with the modification that the disciplinary packet be returned to the hearing officer for correction of the above identified deficiencies. It is noted that this does not entitle the inmate to a new hearing. Finally, the corrections are to be made to the record and this office notified within thirty working days of the Secretary's acceptance of the recommendation.

Id. The Office of the Secretary accepted the recommendation and dismissed complaint WCI-2014-21501 with modification on July 7, 2015. Id. at ¶58.

The Secretary's Office instructed Sabish to be more specific as to the evidence relied upon, so Sabish updated the decision form as directed. Dkt. No. 53 at ¶61. None of the materials in the defendants' Exhibits 1015 or 1016 can be found in the ICRS appeal packet for Conduct Report 2471890. Dkt. No. 80 at ¶31. Id. On July 14, 2015, Sabish emailed "Ms. Reisen,"[3] stating: "Would it

_____
[3] No one explains who "Ms. Reisen" is.

12

be possible to get the contraband for a conduct report on [the plaintiff] #271543 for conduct report #2471890? If you happen to find it could you put it in my mailbox. Thanks." Id. at ¶32. A DOC-1266 Contraband Property Tag for Conduct Report 2471890 appears to have been filled out by Ashworth, who wrote that the "Date Completed" was "10-14-14." Dkt. No. 83 at ¶32. In the lower section of the form, in an unknown person's handwriting, there is another date for the "Hearing Date" which states "10-20-16." Id.

On July 27, 2015, Sabish revised the record as instructed and noted the following as evidence relied upon: Conduct Report 2471890, physical evidence including three pages of phone interviews, thirty-nine copies of money orders/receipts, one Prisoner Assistant form, and six papers of contract documents. Dkt. No. 53 at ¶59. Sabish specifically wrote in the reason for decision section of the revised DOC-84 form:

> Hearing officer reviewed all testimony and evidence, and notes that the inmate admits not guilty. Report writer viewed as credible due to direct observation of the incident, without reason to fabricate the report and has no stake in the outcome of the hearing. 3 pages of a phone interview, 39 copies of money/receipts, 1 prisoner assistant form, and 6 papers of contract documents and inmates (sic) statement were evaluated and reviewed towards the decision. The hearing officer notes no known conflict between the advocate and the inmate . . . Inmate's statement found to be somewhat self-serving and somewhat credible as he states that he didn't violate any of the rules yet states that enterprise and fraud is generically supported but couldn't defend it because he didn't know who sent the money. The hearing officer feels the event, more likely than not, unfolded as recorded and ergo, finds the inmate guilty of 303.32 as he had other inmate send money via a third part (sic) to have them then in return send the money to [the plaintiff] for legal services to the Howard Institute as it is supported in the statement written in the conduct report. The evidence shows that inmate [the plaintiff] was sent a large number of receipts and had an (sic) separate account for the

13

money to be sent to. The receipts were addressed to [the plaintiff] as
the receiver of the receipts at the Howard Institute.

Id. at ¶60.

On July 31, 2015, the plaintiff filed an appeal to the warden complaining

that the revised decision "references evidence that was never submitted at [his]

hearing" and "that [was] not part of the record." Dkt. No. 80 at ¶34. On August

5, 2015, the decision was affirmed along with an explanation: "Hearing officer

addressed inadequacies noted in complaint and expanded description and

detail[.]" Dkt. No. 81-1 at 120.

D.     *Certiorari* Case

The plaintiff filed a petition for a writ of *certiorari* in Dane County Circuit

Court, in which he asked the court to reverse the decisions of the DOC related

to Conduct Report 2471890. Dkt. No. 53 at ¶66. In response to the writ issued

in the circuit court case, counsel for the respondents, Assistant Attorney

General Melissa Schaller, filed a certified record and later supplemented it with

additional documents that were filed under seal. Id. at ¶67. Sabish did not

supplement the *certiorari* record and was not involved in submitting a

supplemental record to the circuit court. Id. at ¶¶68-69. Schaller obtained the

supplement *certiorari* record from Yana Pusich, Waupun's record custodian. Id.

at ¶70.

After briefing from the parties and on consideration of the record, the

circuit court denied the plaintiff's petition for a writ of *certiorari*, and Judge

Lanford held that there was substantial evidence in the record to support a

finding that the plaintiff engaged in enterprising and fraud. Id. at ¶71.

Specifically, Judge Lanford's order states:

> The investigation by DOC staff revealed that [the plaintiff] was using a third party account named Prisoner Assistant to have money transferred to him in exchange for legal work. R. 5. The supplemental documents (filed under seal) show money orders and contracts that corroborate the findings in the conduct report and the conclusion of the hearing officer. Supp. R. 1-25. The supplemental documents also include a phone conversation in which an individual states he paid for materials from [the plaintiff] that he never received. Supp. R. 35. There is nothing in the record to suggest that [the plaintiff] was granted permission to receive monetary payments for legal advice or selling packets of information. Accordingly, the conclusion of the hearing officer is supported by substantial evidence.

Id. at ¶72.

Judge Lanford also held that the plaintiff had received the process he was due under Wolff v. McDonnell, 418 U.S. 539 (1974). Specifically, Judge Lanford wrote:

> [The plaintiff] was given advanced written notice of the violation on October 15, 2014. R. 4. The hearing officer provided a written statement as to the evidence relied upon and the reasons for the disciplinary action. R. 22. At the disciplinary hearing, [the plaintiff] presented a written statement and witness testimony by his staff advocate. R. 22-23. {the plaintiff] argues that his due process rights were violated because he was unable to inspect the physical evidence relied upon in the modified disciplinary hearing. R. 22. However, the opportunity to inspect documentary evidence is not a due process requirement afforded to a prisoner in a disciplinary hearing. See Wolff, 418 U.S. 539. The court finds the department of corrections provided minimal due process protections required under the law.

Dkt. No. 53 at ¶74. Judge Lanford affirmed the decisions of the DOC. Id. at ¶75.

The plaintiff appealed the decision to the Wisconsin Court of Appeals, and that court affirmed Judge Lanford's decision, including the finding that the plaintiff had received all the process he was due under Wolff. State *ex rel.* Howard v. Neitzel, Case No. 2017AP642, 2018 WL 11429865, at *2 (Wis. Ct. App. Nov. 14, 2018). Dkt. No. 53 at ¶76. The court of appeals addressed the plaintiff's complaint that the DOC failed to include his twelve-page letter in the administrative record and that the hearing officer—Sabish—relied on "new" evidence in support of the revised decision:

> [The plaintiff] complains that DOC failed to include in the administrative record a twelve-page letter that he received from an individual named Peg Swan. The conduct report alleged that another inmate, Jeff Poff, had attempted to pay Swan $200 for "legal services." [The plaintiff] asserts that Swan's letter was important to his defense because it would have shown that the $200 he solicited was not for purposes of engaging in business or enterprise, but to pay half of the filing fee for a federal lawsuit in which [the plaintiff] and Poff were plaintiffs. [The plaintiff] concedes that he was given the opportunity to review Swan's letter at the hearing. In addition, the written statement [the plaintiff] submitted at the hearing includes a summary of Swan's letter. However, [the plaintiff] is correct that the letter itself is not included in the record.

> Even if we assume, without deciding the issue, that Swan's letter was improperly omitted from the record, we agree with the respondents' position that the error would have been harmless. An inmate is guilty of enterprises and fraud if the inmate "engages in a business or enterprise, whether or not for profit" or "sells anything except as specifically allowed under other sections." WIS. ADMIN. CODE § DOC 303.36. The hearing officer explained in the revised DOC-84 form that [the plaintiff] was found guilty of enterprises and fraud because [the plaintiff] "had other inmate[s] send money via a third part[y] to have them in return send the money to [the plaintiff] for legal services" and because the evidence showed that [the plaintiff] was sent a large number of receipts addressed to him at the "Howard Institute." The Swan letter is not listed among the evidentiary materials the hearing officer relied upon, and neither the original nor the revised DOC-84 form makes any reference to Jeff Poff or the $200 solicited for Peg Swan. In short, [the plaintiff] has

16

failed to show that inclusion of Swan's letter in the record would have made any difference to his defense or to the outcome of the disciplinary proceedings. Any error, therefore, was harmless. *See* WIS. ADMIN. CODE § DOC 303.88 (through August 2018) ("If staff does not adhere to a procedural requirement under this chapter, the error is harmless if it does not substantially affect a finding of guilt or the inmate's ability to provide a defense.").

Finally, [the plaintiff] asserts that, when the hearing officer was directed by the Corrections Complaint Examiner to issue a revised decision, the officer relied upon "new" documents that were not presented at the original disciplinary hearing, in violation of his due process rights. The revised DOC-84 form lists the physical evidence relied upon as: "3 pages of a phone Interview, 39 copies of money/receipts, 1 prisoner assistant form, 6 papers of [ ] contract documents." The respondents argue that these documents were not actually new evidence, but rather were the same documents that were listed on the original DOC-84 form as "Misc[.] paper work." There is nothing in the record to support [the plaintiff's] assertion that the documents at issue were not reviewed by the committee as part of its initial finding of guilty. Moreover, an opportunity to inspect physical evidence is not among the due process requirements for prison disciplinary hearings. *See Jackson [v. Buchler]*, 330 Wis. 2d 279, ¶50 (stating the three hallmarks of due process that must be satisfied in prison disciplinary actions).

Howard, 2018 WL 11429865, at *2.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477

U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    Discussion

The defendants contend that the statute of limitations bars the plaintiff's retaliation claims against Ashworth and Eckstein regarding his intercepted mail with Swan and Poff. Dkt. No. 52 at 12-13. They also argue that these claims fail because the mail was intercepted for legitimate, non-retaliatory reasons. Id. at 14-17. Next, the defendants assert that the Rooker-Feldman doctrine bars the plaintiff's retaliation claims related to the disciplinary process. Id. at 17-20. They also argue that the court should dismiss these claims because the evidence does not support them. Id. at 21-22. The defendants maintain that the plaintiff cannot recover compensatory or punitive

18

damages. Id. at 22-25. And they contend that they are entitled to qualified immunity. Id. at 25-26.

The plaintiff responds that Ashworth, Eckstein and Sabish retaliated against him during their investigation and subsequent issuance and prosecution of the conduct report by: (1) issuing him a conduct report with unsupported charges; (2) withholding favorable evidence; (3) disposing of favorable evidence presented at the due process hearing; and (4) issuing a revised finding of guilt based on evidence obtained after the hearing.[4] Dkt. No. 78 at 2. According to the plaintiff, the investigation into Swan and the plaintiff was motivated by the publishing of the seg-abuse articles. Id. at 5-10. He contends that the defendants withheld exculpatory evidence from the record. Id. at 10-12. He asserts that Ashworth and Eckstein overcharged him. Id. at 12-13. The plaintiff argues that Sabish destroyed exculpatory evidence. Id. at 13-14. He states that Sabish based his revised decision on newly obtained evidence. Id. at 14-17. The plaintiff contends that the retaliation was likely to deter future activity. Id. at 17-18. He states that the defendants have not offered a non-retaliatory motive. Id. at 18.

The plaintiff contends that the Rooker-Feldman doctrine does not apply because he is not proceeding on claims that his due process rights were violated; he says that he is proceeding on retaliation claims. Id. at 18-19.

---

[4] The plaintiff clarifies that he is not pursuing a claim relating to his mail or correspondence with Swan. Dkt. No. 78 at 20. The court will grant the defendants' motion for summary judgment regarding the plaintiff's first retaliation claim—that Ashworth and Eckstein retaliated against him by intercepting his correspondence with Swan and Poff.

According to the plaintiff, the defendants do not suggest that the state court addressed the defendants' alleged retaliation, so Rooker-Feldman does not apply. Id. at 19. The plaintiff asserts that the defendants are not entitled to qualified immunity. Id. at 19-21. He also contends that grounds exist for a jury to award punitive damages. Id. at 21-22.

The defendants reply that the plaintiff's response fails to refute the applicability of Rooker-Feldman and fails to show any material dispute that would bar summary judgment in their favor. Dkt. No. 82 at 2.

            1.    *Rooker-Feldman Doctrine*

"The Rooker-Feldman doctrine precludes federal courts from deciding cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Andrade v. City of Hammond, 9 F.4th 947, 949 (7th Cir. 2021) (internal citations omitted) (quoting Hemmer v. Ind. State Bd. of Animal Health, 532 F.3d 610, 613 (7th Cir. 2008)). "The rationale for the doctrine is that no matter how wrong a state court judgment may be under federal law, only the Supreme Court of the United States has jurisdiction to review it." Sykes v. Cook Cnty. Cir. Ct. Prob. Div., 837 F.3d 736, 742 (7th Cir. 2016) (citing Brown v. Bowman, 668 F.3d 437, 442 (7th Cir. 2012)).

"To determine whether the *Rooker-Feldman* doctrine bars jurisdiction, [courts] apply a two-step analysis." Andrade, 9 F.4th at 950. First, the court must "consider whether a plaintiff's federal claims are 'independent' or,

instead, whether they 'either "directly" challenge a state court judgment or are inextricably intertwined with one.'" Id. (quoting Swartz v. Heartland Equine Rescue, 940 F.3d 387, 391 (7th Cir. 2019)). "If they are 'independent' claims, the *Rooker-Feldman* doctrine does not preclude federal courts from exercising jurisdiction over them." Id. If the claim directly challenges or is "inextricably intertwined" with the state court judgment, then the court moves on to step two and must "determine 'whether the plaintiff had a reasonable opportunity to raise the issue in state court proceedings.'" Id. (quoting Jakupovic v. Curran, 850 F.3d 898, 902 (7th Cir. 2017)). "Only if the plaintiff did have such an opportunity does *Rooker-Feldman* strip federal courts of jurisdiction." Id.

"Though sometimes understandably labeled a 'metaphysical concept,' the thrust of the 'inextricably intertwined' inquiry asks whether 'the district court is in essence being called upon to review the state-court decision.'" Brown, 668 F.3d at 442 (quotation omitted); see also Young v. Murphy, 90 F.3d 1225, 1231 (7th Cir. 1996) ("[C]onstitutional claims that are 'inextricably intertwined' with state court judgments of necessity call upon the district court to review the state court decision and are thus beyond the district court's jurisdiction."). "The determination of whether a federal claim is 'inextricably intertwined' hinges on whether it alleges that the supposed injury was caused by the state court judgment, or, alternatively, whether the federal claim alleges an independent prior injury that the state court failed to remedy." Brown, 668 F.3d at 442 (citing Long v. Shorebank Dev. Corp., 182 F.3d 548, 555 (7th Cir. 1999)).

21

The defendants contend that the plaintiff's retaliation claims are inextricably intertwined with the state court judgment because the state court considered the disciplinary process and determined that the plaintiff's due process rights under Wolff were satisfied. Dkt. No. 52 at 18. The defendants cite to cases where courts have determined that incarcerated individuals who brought claims seeking federal *habeas* relief challenging their disciplinary convictions failed to state retaliation claims based on prison disciplinary proceedings because they failed to establish a violation of Wolff. Id. at 18-19; see Wilson v. McBride, 93 F. App'x 994, 996 (7th Cir. 2004) ("Prisoners have a right to be free from retaliation by prison officials, but . . . the procedural requirements of *Wolff* adequately protect prisoners from fraudulent charges."); McKinney v. Meese, 831 F.2d 728, 733 (7th Cir. 1987) (incarcerated individual not entitled to *habeas* relief on ground that prison officials allegedly filed disciplinary charge against him in retaliation for acts of another incarcerated individual; protections against such retaliatory actions are the procedures mandated by due process).

In the plaintiff's state court proceedings, the circuit court determined that Sabish's disciplinary decision—which cited supplemental evidence that was sealed—was supported by substantial evidence for the Enterprises and Fraud charge (§DOC 303.36) and that the plaintiff received the process he was due under Wolff. The Wisconsin Court of Appeals affirmed the decision that there was no due process violation. The court of appeals also decided that the fact that the twelve-page letter was not in the record did not cause harm and

that nothing in the record supported the plaintiff's assertion the documents listed in the revised DOC-84 form were not reviewed by the committee for the initial finding of guilt.

The defendants contend that if the plaintiff proves his claim that they retaliated against him, it would call into question the holding of the state court that the plaintiff's due process rights were satisfied. Dkt. No. 82 at 5. Although the court agrees that the plaintiff's retaliation claims relate to the state court decisions and contain overlapping facts, the defendants have not demonstrated that Rooker-Feldman bars the claims. They have not shown that the plaintiff had the opportunity to raise the retaliation claims in state court nor have they shown that the state court judgment caused the plaintiff's injury regarding the retaliation claims. See Lyons v. Gene B. Glick Co., Inc., 844 F. App'x 866, 868-69 (7th Cir. 2021) (citing Iqbal v. Patel, 780 F.3d 728, 730 (7th Cir. 2015)); see also Brown, 668 F.3d at 442. The court cannot conclude that Rooker-Feldman bars the plaintiff's retaliation claims.

### 2. Retaliation

To establish a *prima facie* case of retaliation in violation of the First Amendment, a plaintiff must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." Whitfield v. Spiller, 76 F.4th 698, 707-08 (7th Cir. 2023) (quoting Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009)). If the plaintiff

23

establishes a *prima facie* case, "the burden shifts to the defendant to rebut the claim, that the activity would have occurred regardless of the protected activity." <u>Manuel v. Nalley</u>, 966 F.3d 678, 680 (7th Cir. 2020) (citing <u>Kidwell v. Eisenhauer</u>, 679 F.3d 957, 964 (7th Cir. 2012)). If the defendant makes this showing, the plaintiff "must demonstrate the proffered reason is pretextual or dishonest." <u>Id.</u> (citing <u>Kidwell</u>, 679 F.3d at 969).

The plaintiff claims that the defendants retaliated against him for his proposed class action and for providing information to Swan, as follows: (1) Sabish disposed of the twelve-page letter in retaliation for the plaintiff's conduct; (2) Sabish issued a revised finding of guilt based on evidence he received after the hearing from Ashworth and Eckstein; (3) Sabish provided a supplemental *certiorari* record which omitted several exculpatory documents; and (4) Ashworth issued the plaintiff Conduct Report 2471890 for an improper, retaliatory reason. Dkt. No. 78 at 20.[5]

The record does not support a finding that Sabish disposed of the twelve-page letter, let alone that he did it in retaliation for the plaintiff's protected activity. Sabish was the hearing officer assigned to conduct the plaintiff's disciplinary hearing. The plaintiff has not submitted evidence to support an inference that Sabish took any action to retaliate against the plaintiff for his

---

[5] As stated above, the plaintiff clarified that he is not pursuing claims related to his mail. It also appears that he no longer is pursuing his claim that Ashworth and Eckstein destroyed evidence during the investigation of Conduct Report 2471890. <u>See</u> Dkt. No. 78 at 20. In any event, he has not submitted evidence to support a claim that Ashworth or Eckstein destroyed evidence during the investigation.

correspondence with Swan or his proposed class action. See Jones v. Van Lanen, 27 F.4th 1280, 1284 (7th Cir. 2022) (speculation that prison official was motivated by retaliation insufficient). Even if he had, the plaintiff lacks evidence that Sabish disposed of the letter. And the court of appeals determined that even if the letter was disposed of, it would have been harmless because the plaintiff's statement at the hearing described the letter and because Sabish's guilty finding did not rely on the letter. So the exclusion of the letter from the record was harmless and would not amount to a serious deprivation to support a retaliation claim. The court will grant the defendants' motion for summary judgment as to this retaliation claim against Sabish.

The court also must dismiss the plaintiff's claim that Sabish retaliated against him by submitting a revised finding of guilt based on evidence provided to him by Ashworth and Eckstein after the hearing. The record does not support the plaintiff's assertion that Ashworth or Eckstein provided new evidence to Sabish or that Sabish had an improper motive in updating the guilty finding of the conduct report. Rather, the record shows that Sabish followed the instructions of the Office of the Secretary and the corrections complaint examiner to be more specific as to the evidence he relied on for his decision on Conduct Report 2471890. Sabish requested from a "Ms. Reisen" the "contraband" evidence for the conduct report and issued a revised finding of guilt describing the evidence on which he relied. The court will grant the defendants' motion for summary judgment as to this claim.

The plaintiff's third retaliation claim—that Sabish provided a supplemental *certiorari* record which omitted several exculpatory documents— fails because it is undisputed that Sabish *did not* provide the supplemental *certiorari* record. AAG Schaller obtained the record from Yana Pusich, the Waupun records custodian. This claim is not factually supported, and the court will grant the defendants' motion for summary judgment as to the claim.

Finally, the plaintiff claims that Ashworth issued him the conduct report with unsupported charges in retaliation for the plaintiff providing information to Swan and for the plaintiff's proposed class action lawsuit. Again, the record does not support a finding that Ashworth's motive in issuing the conduct report was retaliatory. DAI Jess assigned Ashworth and Eckstein to lead the Swan investigation. It is undisputed that the investigation revealed that the plaintiff possessed legal materials pertaining to other incarcerated individuals and that Ashworth issued him the conduct report stating that the "search revealed that [he] was in possession of the legal property and materials of 30 other inmates" and there "was information that suggested that [he] was actively assisting several inmates with legal work and the appearance that he was doing this for monetary gain." Dkt. No. 80 at ¶25. The plaintiff acknowledges that "there was evidence that [he] may have been engaged in some form of enterprising," but he asserts that Ashworth and Eckstein overcharged him so they could expose him to more time in segregation. Dkt. No. 78 at 12. The plaintiff's assertion that Ashworth and Eckstein overcharged him in retaliation for his reports to Swan and his proposed class action lawsuit is mere

26

speculation and does not support an inference that Ashworth had a retaliatory motive in issuing the plaintiff the conduct report. See Jones, 27 F.4th at 1284. The court will grant the defendants' motion for summary judgment as to this claim.

A reasonable factfinder could not conclude that the defendants violated the plaintiff's constitutional rights. The court will grant the defendants' motion for summary judgment and dismiss the case.

## III. Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 51.

The court **GRANTS** the plaintiff's motion to dismiss Wall and Weirenga. Dkt. No. 77.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a

motion *in this court.* <u>See</u> Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. <u>Id.</u>

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 26th day of March, 2025.

BY THE COURT:

HON. PAMELA PEPPER
Chief United States District Judge